NEGRO ANNA MARIA WRIGHT *vs.* LLOYD N. ROGERS.
*December,* 1837.

T, the owner of the petitioner, a female slave for life, on the 18th of May,
1832, executed and delivered to her a deed of manumission, which was
duly acknowledged, but not recorded. T, subsequently, not being then in
possession of the slave, sold and conveyed her by bill of sale, duly acknow-
ledged and recorded to a purchaser, having knowledge at the time of the
deed of manumission. This purchaser afterwards sold her to R, to whom
on the 2d of May, 1833, he executed and delivered a bill of sale, which
was acknowledged and recorded according to law.

The legislature, at December session, 1834, ch. 95, passed a law, authorizing
the recording of the deed of manumission; and providing that the same
when recorded, should be as valid and effectual for every purpose, as if it
had been duly recorded within the time required by law. After the deed
had been recorded under this law, the appellant, the negro therein men-
tioned, filed her petition for freedom, but the judgment of the county court
in opposition to her title, was affirmed on appeal to this court.

APPEAL from *Baltimore* county court.

This was a petition for freedom, filed by the appellant,
against the appellee, on the 14th of April, 1835, claiming
her right to freedom, under a deed of manumission from
*Anna Maria Tilghman,* dated the 8th of May, 1832.

After an appearance by the defendant, the case was sub-
mitted to the county court upon the following statement of
facts.

"It is admitted in this case, that the petitioner was the
slave for life of *Anna Maria Tilghman,* of *Talbot* county.
That *Mrs. Tilghman* did execute, acknowledge and deliver
to the petitioner, a deed of manumission bearing date the
18th May, 1832, that said *Anna Maria Tilghman,* did after-
wards sell the said petitioner absolutely to a certain *Tench
Tilghman,* which bill of sale was duly recorded in *Talbot*
county court; that at the time of said sale, the said petitioner
was not in the possession of *Anna Maria Tilghman,* and that
the said *Tench Tilghman,* had knowledge of the said deed of
manumission at the time of said sale. That afterwards, to
wit: on the 2d of May, 1833, the said *Tench Tilghman,* did
transfer by bill of sale of that date with a general warranty of

title, the said petitioner as a slave for life, to the defendant in the above case, for the consideration of $100; which bill of sale was duly recorded in the records of *Baltimore* county. That the aforesaid deed of·manumission was not recorded in due time ; that an act of assembly was passed at December session, 1834, ch. 95, to authorize the recording of certain deeds of manumission, including the deed to the appellant, by virtue of which act, the said deed of manumission from *Anna Maria Tilghman* to the said petitioner, was admitted to record by the clerk of *Talbot* county court, on the 21st March, 1835." . The provision of the act being, "that when the deeds should be recorded, they should be as valid and effectual for every purpose as if the same had been duly recorded within the time required by law."

Upon this statement of facts, the county court gave judgment for the defendant, and the petitioner appealed to this court.

The cause was argued before STEPHEN, DORSEY, CHAM-BERS, and SPENCE, Judges.

C. F. MAYER, for the appellant, contended :

That the act of assembly admitting the deed of manumission to record is constitutionally valid, and has the effect of perfecting the evidence of the appellant's title to freedom against the claim of the appellee, whose remedy is on the general warranty which he has taken in his bill of sale.

There can be no doubt that the act would prevail against *Mrs. Tilghman* and the first purchaser, *Tench Tilghman.*

A grantee who purchases with knowledge is bound as his grantor would have been. *Hudson vs. Warner and Vance,* 2 *Har. and Gill,* 415. *Latouche vs. Dunsany,* 1 *Schol. and Lef.* 157. This applies to *Mrs. Tilghman* and her son. Is the case different in relation to *Mr. Rogers.* It may be argued without reference to the constitutional question. Although the fact is not stated that the appellant was at large at the time of the sale to *Tench Tilghman,* yet as the

contrary is not stated, the court well presumed that she was. The manumission was immediately delivered to the woman, and she went at large. She was ostensibly free when *Tench Tilghman* purchased her, and it does not appear that possession was ever resumed. As to statements of fact these are not enlarged by inferences. But I apply that rule here to the appellee ; and as it does not appear that the appellant was *not* at large when purchased, her being at liberty still continued, and it is not to be inferred that control over her had then been resumed. Connected with the facts, that only *one hundred dollars* had been paid for her, there is good reason to suppose she had a fair moral claim to freedom. This was a question only for the jury—though not urged as far as the court can notice. If true then as a conclusion of law, that the petitioner was at large, the act operated to secure her liberty. It took away from *Rogers* the character of a purchaser without notice.

When we look at the act of 1796, ch. 67, sec. 29, which authorizes the manumission of slaves, we find merely mandatory words, no provisions intended to aid a purchaser and protect him against an unrecorded deed of manumission—no clue that registration was intended for his protection, nor language that annuls the deed for want of it. It is only by argument that the act of recording in season becomes the consummation of the deed of liberation. If it be fair to refer the passage of the act of 1796 to some peculiar policy affecting our black population, it is begging the question to say that the legislature intended to vacate the unrecorded deed for its tendency to beguile purchasers. If it was the policy of the act to guard the proprietor's right, then in its construction you must take with you a residuary right in the legislature to exercise the curing power in cases of failure to record in their discretion. The judicial interpretation ought to follow this motive. The policy of the law is notified to the purchaser, and he takes under the contingency of ulterior legislation. 4 *Cruise,* 545. The master has no right to withhold the solemnity of recording after a manumission

tendered.    Then the *State* is the only party interested. *McCutchen, et al, vs. Marshall,* 8 *Peter,* 220.    *Ketletas vs. Fleet,* 7 *John.* 324.    *Petry vs. Christy,* 19 *John.* 53.    *Negro Tom,* 5 *John.* 365.    *Wheeler on Slavery,* 287, cites a case in point as against a purchaser.

The vendor can convey no greater right than he possesses.

The mere circumstance of a vendor remaining in possession does not add to his rights, nor perfect his title.    *Ross on Sales,* 1.    *Hinde vs. Whitehouse,* 7 *East.* 571.    *Mucklow vs. Mangles,* 1 *Taunt.* 318.    *Langfort vs. admr'x of Tyler,* 1 *Salk.* 113.    The latent legal right is enforced.    *Karthaus. vs. Owings,* 4 *Har. and John.* 263.    Possession is not conclusive on a question of manumission.    *Patty and others vs. Colin and others,* 1 *Hen. and Munf.* 519.    *Allein vs. Sharp,* 7 *Gill and John.* 96.

G. L. DULANY, for the appellee.

By the statement of facts in this case, it appears that *Mrs. Anna M. Tilghman* executed a deed of manumission to her female slave, *Maria Wright,* on the 18th of May, 1832; this deed was *not* recorded within *six* months after its date as required by the act of 1796, ch. 67, sec. 29.    *Mrs. Tilghman* afterwards, sold *Maria* to *Tench Tilghman,* who, by bill of sale dated the 2d of May, 1833, transferred her as a slave for life to *Lloyd N. Rogers,* the defendant below, who for aught that appears, *was wholly ignorant of the deed of manumission aforesaid.*

By an act of the legislature, passed 23d of February, 1835, December session, 1834, ch. 95, sec. 1, the clerk of *Talbot* county was authorized to admit to record, "three several deeds of manumission from *Ann Maria Tilghman,* of which the above deed was one, and that when recorded, they should be as valid and effectual for every purpose as if the same had been duly recorded within the time prescribed by law."

Under this act the deed to the appellant was recorded by the clerk of *Talbot* county 21st March, 1835.

As the law before stood, it is as clear as any proposition can be made by the decision of the highest tribunal, that by the deed of manumission from *Mrs. Tilghman*, the appellant acquired no right to freedom, either of a qualified or absolute character which could be enforced in law or equity. Such an instrument conveyed no right until recorded, and if the time elapsed within which it should be placed on record, a court of chancery had no power to afford redress. The deed itself gave *not* even an inchoate right to freedom, liable to be divested, by neglecting to have it recorded within the time prescribed by law; but the act of placing the deed upon record, is itself the only, and effective origin of any right to be claimed under it. The deed not having been recorded, the appellant was at the time she was purchased by the defendant below, as much a slave, with as little right in law or equity to escape from that condition as if the deed of manumission from *Mrs. Tilghman* had never been executed. *Hicks vs. Chew*, 4 *Har. and John.* 546, is a conclusive case on this point.

The act of 1834, however, provides that the deed to the appellant may be recorded, and that when so done, it shall be as valid and effectual as if it had been enrolled within the period prescribed by law. Now, as the appellant would have been free if she had placed on record the deed which was executed in her behalf within the prescribed period, and as the act gives to the deeds recorded under it the same effect, as if they had been regularly placed on record, it follows, that the appellant, who before the passage of the act was a slave of the defendant below, by a perfect title, has by virtue of a compliance with the terms of that act, if valid, obtained her freedom, and that too, without the consent of her master or any compensation for his loss.

If then she is free, that boon has been conferred upon her by a high legislative act, when independent of that act, and notwithstanding the deed of manumission, her master and those under whom he claims, had done nothing which operated either in law or equity to bestow freedom upon her, or

24      v.9

in the least to impair their title to her services.   The deed of manumission was wholly ineffectual, and without obligation of any kind.   It gave her absolutely nothing.   She was by the authority of the decision of the court of Appeals before referred to, as much the slave of her mistress, and by as perfect a title in law or equity *after* the deed had been executed, but not recorded, as before.   The court will perceive then, that the immediate object and necessary effect of the law of 1834, is to take from the master his slave, to whose person and services at the time of its passage, he possessed a clear title, and that too, not indirectly by enacting some provision, creating a new rule of evidence, or regulating the remedy which might have affected his case, but by striking at and directly destroying his vested and absolute right to her person and services.   For the direction in the act "that the deed may be recorded" is nugatory when standing alone; it is the additional declaration that when recorded, it shall have the same effect as if it had been recorded in time, which gives to the law its obnoxious character, of arbitrarily disturbing the private rights of property.   For although it has been contended otherwise, yet I think it cannot be well questioned in this, and all other *states* where slavery exists, that a human being may be as much the subject of property as any chattel that a man may possess.   And that viewed in this respect, any law which affects the rights of the master must have the same consideration, as if passed in relation to his land or personal estate.

Now if it be true that at the time the act in question was passed, that *Maria Wright* was the slave of *Rogers*, by virtue of his title acquired under *Mrs. Tilghman*, if the previous deed of manumission gave her no title to freedom in any court, and if the opposing right of her master could without question have been enforced in all, does it not follow, that the act of 1834, which professes to give validity to a void deed upon its being recorded, proves as clearly destructive to a vested right, as if it had said without reference to the deed, *Maria Wright* shall be free.

That it transcends the power of the legislature to disturb vested rights, although in so doing they might not violate the constitution of the *United States*, is a proposition as it seems to me placed beyond doubt, both upon reason and authority. Such a power is utterly inconsistent with the legitimate objects of government, one of which, and perhaps the most essential, is not to take away the property of its citizens, but to secure them in the peaceable enjoyment of it. It is often in argument assumed as an axiom, that the legislature cannot take the property of A, and bestow it upon B. It has been decided that such a proceeding would be void, even where the property taken was appropriated to public uses without compensation, as against the fundamental principles of all free government, even where there was no positive prohibition in the constitution of the state or of the *United States*, which forbade it. See *Bradshaw vs. Rogers and Mayer*, 20 *J. R.* 105, 106. *Catolen and wife vs. Bull and wife*, 3 *Dallas*, 387, 388. See also the protest of *D. Dulany*, 3 *Har. and John.* 309. 3d *Story's Constitutional Law*, 667.

The only question then that can be mooted in this case is whether the act of 1834 does destroy the vested right which *Rogers* had to the person and services of *Maria Wright*, under the laws as they existed before the passage of the act.

I assume that *Rogers'* right was a vested one, and this assumption cannot I think, be denied to me; for if a right which could be immediately and effectually enforced, (if invaded,) both in law and equity, be not a vested one, by what incidents and characteristics shall it be known and described?

If then *Rogers* had a complete vested right in the person and services of the petitioner, and the act in question while this right subsisted, declared in substance, no matter by what mode of expression, that it should cease, and that the appellant should be emancipated from the control of her master, does it not manifestly and wholly deprive him of his right, and upon the prohibition of the 21st article of the declaration

of rights, that no man ought to be deprived of his property but by the judgment of his peers, or the law of the land, as well as upon those principles already stated, ought not such an act to be pronounced absolutely void.

It is not necessary to shew that the act in question is contrary to the constitution of the *United States.* It is sufficient that it violates our own constitution, and those fundamental principles of free government which are entitled to equal, if not superior consideration.

It is admitted that every law which disturbs or destroys *vested* rights does *not* necessarily impair the obligation of contracts, and is not therefore contrary to the constitution of the *United States ;* but it is equally certain, that laws which affect vested rights, may, and frequently do impair the obligations of contracts, in which case it is clear they are annulled by the constitution of the *United States.*

Is not the act of 1834 of this character? Does it not obviously invalidate the bill of sale from *Tilghman* without giving *Rogers* any remedy on the implied warranty of title which accompanies the sale of all personal chattels ; in as much as when the bill of sale was given, the title was valid, and is destroyed only by a subsequent act of legislation ; hence, there is no breach of the warranty, and *Rogers* would loose his property without redress ? What then becomes of the obligation of his bill of sale, is it not utterly destroyed ? and if so, how can the law of 1834 subsist with the constitution of the *United States.*

The bill of sale according to the law, as it existed at the time when it was executed, gave to the defendant below, an absolute property in the appellant; if she is taken from him by the interference of the legislature, and the responsibility of *Tilghman* is by the same interference superseded, such act of deprivation at once destroys his vested right, and the obligation of the contract under which he held her, and is equally inconsistent with the constitution of the *United States,* the declaration of rights, and those fundamental principles which lie at the foundation of all our governments, and impose

wholesome restraints upon the capricious exercise of mere unconfined and arbitrary authority.

There must be some things in every free government, which not even the whole people through their representatives can do; and if they should be restrained in any thing, surely it is in taking the property of the citizen, without his consent, without compensation to him, or the urgency of any public demand, for the security of property is perhaps of all the objects of governments, the most essential. Suppose an act of the legislature should pass, taking away $10,000 of the surplus wealth of A., who is worth a million, and distributing it in charity among the poor, is it possible that such a law would be enforced in a court of justice, and yet if the legislature can take away my slave and confer upon her the privilege of freedom, they do nothing more than proceed upon a principle, which if just, would authorize them to scatter the superabundance of the rich to relieve the pressing wants of the poor.

There is no safety for any man but in the controlling power of the courts, acting, not upon temporary excitements, but on fixed principles, to annul every law under whatsoever fair pretext or humane motive it may have been enacted, which takes from a citizen any thing which according to the existing laws may be the subject of property, no matter whether the law is to restore to a human being his natural right of freedom, or to the poor, their natural rights to have their urgent necessities supplied, from the superabundance of others.

One of the great errors of the argument of the counsel on the other side is the assumption that the deed of manumission was a contract with *Maria Wright*, that the neglect to record it on her part, was a mere omission of a formal requisite, and that the act of 1834 comes in aid of this technical defect, and thus substantially assists the obligation of the contract, and the intention of the parties.

The following quotation from the case of *Hicks and Chew* will shew how much the law has been mistaken on this

point : "By the laws of this state, a negro, so long as he is a slave, can have no rights adverse to those of his master ; he can neither sue or be sued. Nor can he make any contract, or acquire any rights under a deed which either a court of law or of equity can enforce. And as it is the recording of a deed of manumission within the time prescribed by law, which entitles him to freedom, he continues a slave, and can acquire no rights under such an instrument, until it is so recorded, and consequently cannot go either into a court of law or equity for relief of any kind."

There was then no obligation whatever flowing from the deed of manumission by which *Mrs. Tilghman* was bound to her slave. It contained no contract; the relationship of mistress and slave existed between them, as fully, perfectly, and absolutely, after the deed as before, and if so, the deed could have no more efficacy in laying a just foundation for the law of 1834, than is presented by every instance of slavery in the state. In other words, it would be as competent to the legislature to emancipate a slave where his master had given *no* deed of manumission, as in the instance where one had been executed and delivered, but *not* recorded ; for the court of Appeals have decided that such a deed gave no right whatever, and possessed no obligation, and where can be the difference of the non-existence of a deed as a matter of fact and the existence of a deed which yet is absolutely void both in law and equity ? What then can be the rational distinction between a law which enacts that a slave shall be free when no deed had been given, and enacting that a purely void instrument shall be recorded, and constituting that act an effectual and valid title to freedom against the otherwise rightful claim of the master.

Would not each of these instances of legislation equally and as flagrantly violate the vested rights of property. In both the slave would be taken away without compensation, not for public purposes and without the consent of the owner, for it cannot be said that the deed itself was such an assent as removed from the law the fatal objection that it was passed without his acquiescence.

Some time after the deed had been given, and the time within which it should have been recorded had elapsed, *Maria Wright* was sold to *T. Tilghman* as a slave for life, and by him conveyed to the defendant in this cause, and whilst in his possession, and sometime after he had acquired the rights of a master, the law in question was passed, it surely cannot be said that the deed by any possible mode of considering it implied the assent of *Rogers*, or even of *Mrs. Tilghman*, to the passage of the act—and if not, what influence can the deed exert when taken in connection with the law to eradicate its essential characteristics of an unconstitutional and arbitrary exercise of authority. By the decision already referred to it was determined that the deed was no contract, imported no obligation, legal or equitable, conferred upon the petitioner no rights of which any court could take cognizance, how then is it possible that an act thus indifferent could have the curative effect of rendering a law otherwise obnoxious to strong constitutional objections, legal and proper. It cannot be even truly argued that *Mrs. Tilghman* imposed upon herself a moral obligation to liberate her slave by any other and future act. The deed was a simple gift, without consideration, operating only if it should be recorded, and the giver did nothing to deprive the object of her bounty of the benefit intended her, or to defeat the potential operation of her own instrument, that the petitioner was not completely manumitted, was the effect of her own negligence in omitting to comply with those legal requisites with which it was not in the power of *Mrs. Tilghman* to dispense, and there is nothing in the deed which expresses or implies a promise or undertaking that any future instrument would be executed, should the one she was about delivering become inoperative through the carelessness of the person most interested in it.

Should we disapprove of the conduct of *Mrs. Tilghman* in the subsequent sale of the appellant it would be yet difficult to point out what precise moral obligation was violated by that act, and if the deed carried with it neither a legal, equi-

table, or moral obligation, the mere fact of its existence as a nugatory paper, could impart no quality whatever to the law of 1834, but that act is left with the same despotic character which it would have possessed, had the deed never been executed, and must be declared absolutely void if the principle be sound that the legislature has no power to destroy the vested rights of private property. We contend then—

1. That the legislature has no power or authority under the bill of rights, or upon the fundamental principles of any just and free government, to take away the property of a citizen by law, to which, under the previous legal establishment he had a perfect title without his consent, except for public uses, and then only upon adequate compensation.

2. That the deed of manumission was so far from being a contract, having been delivered to a slave, that it was not even a gift binding upon the giver, who might the moment after have taken it back; that not, however, having been thus resumed, a mere power was granted to the petitioner to acquire the rights of freedom by placing the deed on record, that omitting to do this act within the prescribed period through her own default, this power became forever lost, and by the then existing laws, she continued as much a slave with as little title in law or equity to be freed, as if the deed had never been executed.

And, 3d, That the act of 1834, is therefore void, as its immediate object and necessary effect is to deprive the defendant of the absolute property which he held in the person and services of his slave, under the law as it existed at the time the act was passed.

It is not necessary I think to refer to the instances which have been cited by the learned counsel in his argument of retrospective laws, statutes of limitation, insolvent laws and laws abolishing imprisonment for debt, &c. as cases in point on his side of the question in this cause. For in the first place, I do not contend that the act of 1834 is void because it is merely retrospective, but because it destroys vested

rights; and in the other instances of legislation which he has enumerated, when they have been upheld by judicial decisions, they have been supported on the ground that they were not aimed at the destruction of vested rights; but were enacted to regulate the remedy of the party in the pursuit of those rights, leaving of course the rights themselves untouched.

JUDGMENT AFFIRMED.